UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

VAGUELY QUALIFIED PRODUCTIONS LLC,

        Plaintiff,

    -against-

METROPOLITAN TRANSPORTATION
AUTHORITY; THOMAS F. PRENDERGAST, in
his official capacity as Chairman and Chief
Executive Officer of the MTA; and JEFFREY B.
ROSEN, in his official capacity as the Director of
the MTA Real Estate Department,

        Defendants.

———————————————————————x

No. 15 Civ. 04952 (CM)

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 10/7/15

## MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS MOTION TO DISMISS THE COMPLAINT

McMahon, J.:

    Before the Court is Plaintiff Vaguely Qualified Production's ("VQP" or "Plaintiff")

motion for a preliminary injunction, pursuant to Rule 65(a) of the Federal Rules of Civil

Procedure, seeking to require the Metropolitan Transportation Authority ("MTA" or, together

with defendants Thomas F. Prendergast and Jeffrey B. Rosen, "Defendants") to display VQP's

advertising campaign for its film *The Muslims Are Coming!* in the New York City subway

system.  Plaintiff contends that Defendants' refusal to run its advertisements violates the Free

Speech Clause of the First Amendment and 42 U.S.C. § 1983.

    Also before the Court is Defendants' motion to dismiss Plaintiff's amended complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

1

For the reasons that follow, the Court grants Plaintiff's motion for a preliminary injunction and denies Defendants' motion to dismiss.

## BACKGROUND

### I.    MTA's Advertising Policies

The MTA is a New York state public authority and public benefit corporation, which provides mass transportation services in the New York City metropolitan area. Compl., Dkt. No. 1 ¶ 13. Defendant Thomas F. Prendergast is the Chairman and Chief Executive Officer of the MTA, and Defendant Jeffrey B. Rosen is the Director of the MTA Real Estate Department, which oversees the MTA's advertising program. *Id.* ¶¶ 15-16.

The MTA accepts advertisements for display within transit facilities and on buses and subways in order to raise revenue for its operations. Rosen Decl. ¶ 4. To administer its advertising program, the MTA enters into license agreements with advertising companies, including OUTFRONT Media Inc. ("Outfront"), formerly CBS Outdoor Americas Inc., the company that served as a go-between for the parties in the instant case. Dkt. No. 41 at 6.

### A.    MTA's Prior Advertising Policy and the AFDI Litigation

From 1994 until April 2015, the MTA accepted and displayed both commercial and non-commercial ads, including political ads. *See* Rosen Decl. ¶¶ 9-30; *American Freedom Defense Initiative v. Metropolitan Transp. Authority*, 880 F. Supp. 2d 456, 460 (S.D.N.Y. 2012) ("AFDI I"); Compl. Ex. G.  In 1998, the Second Circuit held that the MTA had made itself a "designated public forum" by adopting this policy, which meant any content-based restrictions on advertisements were subject to strict scrutiny. *See N.Y. Magazine v. Metropolitan Transp. Authority*, 136 F.3d 123, 130 (2d Cir. 1998). The MTA's advertising policy in 2014, when VQP began trying to place its ads in the subways, was, in all relevant respects, identical to policy that

2

was the subject of the Second Circuit's decision in *N.Y. Magazine*. Dkt. No. 41 at 13. I will refer to this advertising policy as the "Prior Policy."

In 2014, the American Freedom Defense Initiative (the "AFDI"), a pro-Israel advocacy organization, initiated an advertising campaign, which included an ad featuring a photo of a man wearing a headscarf with the statement, "'Killing Jews is Worship that draws us close to Allah' – Hamas MTV / That's his Jihad. *What's yours?*" (the "AFDI Ad"). Rosen Decl. ¶ 36; *American Freedom Defense Initiative v. Metropolitan Transp. Authority*, 70 F. Supp. 3d 572, 574 (S.D.N.Y. 2015) ("AFDI II").   The MTA rejected the AFDI Ad under the Prior Policy as violating the provision prohibiting ads that might incite or provoke violence that would disrupt the MTA's transportation operations.  Rosen Decl. ¶ 37; *see* Compl. Ex. G § (a)(x).

The AFDI filed suit seeking an injunction to compel the MTA to run its advertisements. On April 20, 2015, my colleague The Hon. John Koeltl concluded that the MTA's rejection of the AFDI Ad violated the First Amendment under strict scrutiny analysis. AFDI II at 584. The court granted the AFDI's motion for a preliminary injunction requiring the MTA to run the AFDI Ad, but stayed enforcement of the injunction for thirty days. *Id.* at 585.

**B.   MTA's New Advertising Policy**

On April 29, 2015 – after Judge Koeltl granted the AFDI's preliminary injunction – the MTA's Board voted 9-2 to adopt a new advertising policy (the "New Policy"). *Id.* ¶ 65. The New Policy states at the outset that one of its two primary purposes is to "convert the MTA's Property from a designated public forum into a limited public forum by excluding advertising of a political nature after the Effective Date."

In the section headed "Objective," the New Policy provides that "the MTA does not intend that the advertising permitted to be displayed in and on the Property be created, designated, or used as a public forum for expressive activities or general discourse or opinions."

3

Compl. Ex. I §§ I, III. Among the specific objectives listed are, *inter alia*, "Maximize advertising revenue"; "Minimize the resources and attention that have been expended to resolve disputes relating to the permissibility of certain political advertisements, thus unnecessarily diverting the organization from performing its mission"; and "Avoid identification of MTA with, and the appearance of MTA endorsement of, the advertisements of non-MTA parties displayed in or on the Property … ." *Id.* § III.

To accomplish these objectives, the New Policy provides that the MTA will accept only three categories of advertisements: "paid commercial advertising, certain public service announcements that will help build goodwill for the MTA among its riders and the public, and governmental messages." *Id.* § III. "Commercial advertising" is defined as:

> Paid advertisements that propose, promote, or solicit the sale, rent, lease, license, distribution, or availability of, or some other commercial transaction concerning, goods, products, services, or events for the advertiser's commercial or proprietary interest, or more generally promote an entity that engages in such activities.

*Id.* § IV.A.1.

The New Policy also provides, "Notwithstanding the foregoing [categories of permitted ads], the MTA will not accept any advertisement for display in or on the Property if it falls within one or more of the … categories" of "Prohibited Advertising." *Id.* § IV.B. In other words, regardless of whether an advertisement falls into a permitted category, if it also falls into a prohibited category, the MTA will not accept it.

One such prohibition is on advertisements that are "political in nature, including but not limited to advertisements that either:

> a. Are directed or addressed to the action, inaction, prospective action or policies of a governmental entity, except as permitted in Sections IV.A.2- IV.A.3 of this Policy; *or*
>
> b. Prominently or predominately advocate or express a political message,

4

including but not limited to an opinion, position, or viewpoint regarding disputed
economic, political, moral, religious or social issues or related matters, or support
for or opposition to disputed issues or causes." *Id.* § IV.B.2.

The term "political message" is thus defined as any message that expresses a viewpoint about a

disputed economic, political, moral, religious or social issue, or some matter related to such

issues.

After it implemented the New Policy, the MTA moved to dissolve the preliminary

injunction compelling it to run the AFDI Ad. On June 19, 2015, Judge Koeltl granted that

motion, holding that the AFDI's motion for injunctive relief had been rendered moot by the

change in policy. *See American Freedom Defense Initiative v. Metropolitan Transp. Authority*,

2015 WL 3797651 at *5-6 (S.D.N.Y. June 19, 2015) ("AFDI III").

## II.     The Proposed VQP Advertising Campaign

Plaintiff is a for-profit limited liability company formed under the laws of the state of

New York.  As a video production company, VQP specializes in "smart, insightful, and comedic

social justice media." It has produced humorous documentary and feature films since 2005.

Farsad Decl. ¶¶ 4-5.

In 2013, VQP produced a feature film documentary, *The Muslims Are Coming!*, which

follows a group of American Muslim comedians as they travel across the country, performing

stand-up comedy and interacting with locals. The film is available for purchase on DVD and

Blu-Ray and can be viewed through various online media. *Id.* ¶ 6.

In September 2014, VQP launched a campaign to purchase MTA advertising space that

would promote *The Muslims Are Coming!* using satire, irony, and other comedic techniques to

demonstrate, through humor, that "American Muslims are ordinary people." *Id.* ¶ 6. VQP

conducted a campaign to raise money from the public for the advertisements; it was called *The

Fighting-Bigotry-with-Delightful Posters Campaign!*. According to VQP, the timing of the

campaign was prompted in part by VQP's "ongoing contractual relationship with its online distributors," and was also in part a reaction to the AFDI's announcement that *it* planned to purchase advertising space in the MTA subway system to display ads critical of Muslims, like the AFDI Ad. *Id.* ¶¶ 7-9. After raising the money for its campaign, on October 1, 2014, VQP posted the following message on the film's website: "As of Sept. 2014, a really lame group of bigoted folks got together to post a bunch of hateful and defamatory ads about Muslims all over the New York City subway system. In response, we thought, why not post our own ads? Ads that aren't hateful, but totally loving, hilarious, and/or ridiculous." Kovner Decl. Ex. 6. *See also id.* Ex. 3. In a subsequent article, posted on the Daily Beast website and accessible via link from the film's website, campaign organizers Dean Obeidallah and Negin Farsad explained that the campaign was an effort to make the "hateful images" of the AFDI ads "less culturally acceptable" by "present[ing] an uplifting, funny, and absurd side of Muslims that we rarely ever see in the media." Kovner Decl. Ex. 5.

VQP's six proposed advertisements included statements such as, "The Ugly Truth About Muslims: Muslims have great frittata recipes." One proposed ad lists the following three "facts" about Muslims: "Muslims invented Justin Timberlake [...] Grownup Muslims can do more pushups than baby Muslims [and] Muslims invented the concept of a hospital." Below, the ad states: "(Well, the thing about the hospitals is true, the other two might be kinda true)." A third ad declares that "Muslims hate terrorism! They also hate: People who tell you they went to an Ivy League school within 10 seconds of meeting them ... When the deli guy doesn't put enough schmear on your bagel ... Hipsters who wear winter hats in the summer ... the pickling of everything ..." Compl. Ex. A, B, E. One of VQP's advertisements features the logo of *The Muslims Are Coming!* in a font evocative of classic horror films. *See id.* Ex. D.

All of VQP's proposed advertisements state at the bottom left, "For more visit: www.themuslimsarecoming.com." *Id.* Ex. A-F. That website includes, *inter alia*, a trailer for the film, links to various online sources from which viewers can rent or purchase the film, photographs of featured comedians, and quotations from and links to reviews of the film. *See* www.themuslimsarecoming.com (last visited October 5, 2015).

**III.    The MTA's Approval of VQP's Ad Campaign Under the Prior Policy**

On November 10, 2014, VQP submitted proposed artwork for its advertising campaign to Outfront. On November 17, 2014, Outfront confirmed the MTA's receipt of the artwork. Farsad Decl. ¶¶ 11-12. At that time, the MTA's Prior Policy was still in force.

Between December 2014 and March 2015, the MTA, through Outfront, requested various changes to VQP's ads, including removal of the word "penis" from a joke in one advertisement, removal of the phrase "stepping in poop" from another, and revision of the font in a third. VQP complied with all of the MTA's requests. *Id.* ¶¶ 13-17.

Throughout the approval process, Outfront and the MTA did not always reply to VQP's resubmissions and questions promptly; in January 2015, Outfront noted to VQP that the process was taking "longer than usual." *Id.* ¶ 16, Ex. 16. Part of the delay may have been due to Defendants' desire to know more about VQP before approving the ads. On February 3, 2015, following an inquiry by VQP, Outfront informed VQP that the MTA had requested information about VQP itself, presumably to inform a decision about whether to run the ads. *See id.* ¶ 20. In response to Defendants' request, Outfront sent Defendants a "link showing all the companies" with which VQP had previously worked. *Id.* ¶ 20, Ex. 24. Nonetheless, the approval process continued slowly, and VQP became frustrated with the pace of the process and contacted the Office of the Public Advocate for the City of New York, asking the Office to contact the MTA on its behalf. *See id.* ¶¶ 12-25.

7

Finally, on March 25, 2015, VQP learned that the MTA had approved its advertisements. *Id.* ¶ 25. This means the MTA reached a vastly different conclusion about VQP's ads than it had about AFDI's ads; the latter were deemed potentially inciting of violence, while the former were not.

On April 3, 2015, VQP signed and returned to Outfront an initial contract requiring the MTA to display the advertisements throughout the New York City subway system from April 13, 2015, through May 10, 2015. *Id.* ¶ 26, Ex. 34. Outfront and VQP subsequently revised the contract to provide for display in the subway system for 28 days from April 27, 2015, through May 24, 2015. *Id.* ¶ 27, Ex. 36. On April 14, 2015, VQP sent Outfront the executed revised contract to post the advertisements in 144 subway station locations across New York City. *Id.* ¶¶ 28-29, Ex. 37, 39.

## IV.    The MTA's Denial of VQP's Ad Campaign Under the New Policy

As the vote to amend the MTA's policy approached, the MTA asked Outfront to identify any pending ad campaigns that might not comply with the New Policy. Rosen Decl. ¶ 88. VQP's ads were among those Outfront flagged as possibly "political." *Id.*

After reviewing VQP's ads, the MTA determined that the ads were "political in nature" and therefore prohibited under the New Policy. *See* Compl. ¶¶ 38-41. On May 1, 2015, Defendants' counsel informed VQP via telephone that the MTA would not permit display of the advertisements in the subway system. Farsad Decl. ¶ 35.

On May 6, 2015, VQP asked for a decision in writing from Defendants. *Id.* ¶ 36, Ex. 44. On May 6, 2015, Defendant Rosen issued a decision regarding VQP's advertisements. The decision concluded that the ads were prohibited under the MTA's New Policy because they were political in nature. The decision reads, in relevant part:

Acting on a proposal that had been under consideration since 2012, the MTA

8

Board on April 29, 2015, adopted a new MTA Advertising Policy, effective immediately. . . . An article about the "Muslims are Coming" advertising campaign . . . described it as a response to a "campaign of hateful, anti-Muslim ads in the New York City bus and subway system" sponsored by [AFDI], and an effort to make the "hateful images" of the AFDI advertisements "less culturally acceptable." . . . I have reviewed the six "Muslims are Coming" advertisement [sic] under the new MTA Advertising Policy and have concluded that they are within one of the categories of prohibited advertisements, Section IV.B.2, because they are political in nature. Taken together, the Muslims are Coming advertisements prominently or predominately advocates or expresses a political message-Vaguely Qualified Production's opinion, position, or viewpoint regarding a disputed political, moral, religious or social issue or related matters or its support for or opposition to disputed issues or causes.

Farsad Decl., ¶ 37, Ex. 45. The MTA did not specify what disputed political, moral, religious or social issue, or what disputed issue or cause, were manifested in the advertisements themselves (as opposed to in the article on the Daily Beast web site).

## V.    Procedural History

On June 25, 2015, VQP filed this lawsuit. The original complaint asserted two First Amendment claims: (1) that Defendants violated VQP's constitutional rights by purposefully and unreasonably delaying the approval of VQP's advertisements for four months under the MTA's Prior Policy, and (2) that Defendants violated VQP's constitutional rights by rejecting their advertisements under the MTA's New Policy. VQP also asserted a claim for breach of the advertising contract and a claim for promissory estoppel to recover damages VQP incurred in alleged reliance on the MTA's promise to display the ads. *See* Compl., ¶¶ 44-71.

On July 8, 2015, the MTA issued a refund to VQP for the money it had paid to display the ads ($15,000), and, on July 9, 2015, the MTA reimbursed VQP the money that VQP had spent printing posters to be displayed under the contract ($3,762.72). Amended Compl., Dkt. No. 22 ¶¶ 44-45. One week later, VQP dropped the third and fourth claims from the lawsuit. *See* Amended Compl.

9

On August 10, 2015, after negotiations failed to result in an acceptable compromise, VQP

filed this motion for a preliminary injunction, accompanied by declarations and a memorandum

of law. Dkt No. 41 at 13; *see* Dkt Nos. 30-34. VQP filed a supplemental declaration on August

20, 2015. Dkt No. 38. The Defendants responded to the motion and filed a cross motion to

dismiss Plaintiff's amended complaint on August 28, 2015. Dkt Nos. 39-42.

## DISCUSSION

### VI.     Standard of Review

#### A.      Preliminary Injunction

To obtain a preliminary injunction, plaintiff "must establish that [it is] likely to succeed

on the merits, that [it is] likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*

*v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Where the movant seeks a mandatory

injunction (one that will alter the status quo) rather than a prohibitory injunction (one that

maintains the status quo), the likelihood-of-success standard is elevated: the movant must show a

clear or substantial likelihood of success." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d

77, 97 (2d Cir. 2005).   Here, Plaintiffs ask the Court to require the MTA to display its

advertisements – something the MTA has refused to do.   An injunction in this case would alter

the status quo, so the higher "clear or substantial likelihood of success" standard applies.

#### B.      Motion to Dismiss

"To survive a motion to dismiss under Rule 12(b)(6) ... a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Mabry v. Neighborhood Defender Svc.*, 769 F.Supp.2d 381, 389 (S.D.N.Y.2011) (citing *Ashcroft*

*v. Iqbal*, 556 U.S. 662 (2009)). "[A] plaintiff's obligation ... requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Iqbal*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678; *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). However, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Iqbal*, 556 U.S. at 679. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. However, "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (internal quotation marks and citation omitted).

## VII.   Plaintiff's Motion for a Preliminary Injunction for Violation of the First Amendment under the New Policy

Plaintiff does not mount a facial challenge to the MTA's policy either in its complaint or in its motion for a preliminary injunction – perhaps because the Supreme Court and numerous courts of appeal have made clear that transit authorities are entitled to enact advertising policies that restrict political speech. *See, e.g., Lehman v. City of Shaker Heights*, 418 U.S. 298, 303–04 (1974); *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 656 (2d Cir.), opinion amended on denial of reh'g, 89 F.3d 39 (2d Cir. 1995); *Am. Freedom Def. Initiative v. Suburban*

*Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 890 (6th Cir. 2012). Rather, VQP challenges the application of the policy to its proposed advertisements.

When a plaintiff claims a violation of free speech, as here, courts presume irreparable harm because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *N.Y. Magazine*, 136 F.3d at 127 (internal citation and quotation marks omitted). *See also Amaker v. Fischer*, 453 Fed.Appx. 59, 63 (2d Cir. 2011) *(citing Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003)) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed"). Thus, the Court must consider whether there is a clear or substantial likelihood of success on the merits, whether the balance of equities tips in VQP's favor, and whether an injunction is in the public interest. *See Winter*, 555 U.S. at 20.

## A. Plaintiff Has Demonstrated a Clear Likelihood of Success on the Merits

### 1. The MTA's Decision Must be Reasonable and Viewpoint Neutral

Where the government denies speech by restricting access to its own property, the level of scrutiny to which its decision is subject depends on the type of forum for speech the government has created. *N.Y. Magazine*, 136 F.3d at 128. Thus, to determine the likelihood of success on the merits in this case, the Court must consider the type of forum and whether the MTA's justification for denying VQP's advertisements satisfies the corresponding standard of review.

The Supreme Court has established three types of fora for speech: (1) the traditional public forum, (2) the designated public forum, and (3) the nonpublic forum. *Id*. In this Circuit, the designated public forum admits of a sub-category in which the government "'opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'" *Id*. (quoting *Travis v. Owego–Apalachin Sch. Dist.*, 927 F.2d

12

688, 692 (2d Cir.1991)). In such a so-called "limited public forum," "restrictions on speech that falls within the designated category for which the forum has been opened" are subject to strict scrutiny. *Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002). Restrictions on speech that falls outside the designated category "need only be viewpoint neutral and reasonable" to avoid running afoul of the First Amendment. *Id.* at 546.

The MTA's New Policy specifically states that the MTA intended to "convert the MTA's Property from a designated public forum into a limited public forum by excluding advertising of a political nature after the Effective Date." Compl. Ex. I § I(B). VQP does not challenge the MTA's reclassification of its property, and so I assume, for the purposes of this opinion, that the MTA has indeed managed to turn itself into a limited public forum. Dkt. No. 31 at 27.

Though VQP accepts the MTA's self-designation as a limited public forum, the parties do not agree about what level of scrutiny applies to the MTA's decision not to display VQP's ads. Defendants state that the MTA's decision need only be "reasonable and viewpoint neutral," insisting that previous courts that have reviewed decisions excluding speech from limited public fora have all applied that standard of review. Dkt. No. 41 at 16-19. In contrast, VQP argues that the MTA's designation of its ads as "political" constitutes "a restriction on speech that falls within the designated category for which the forum has been opened," namely, commercial speech. Dkt. No. 46 at 21, *Hotel Emps.*, 311 F.3d at 545. Thus, Plaintiff argues, the exclusion of its commercial speech on the ground that the advertisements are also political is subject to strict scrutiny.

The Court is not persuaded. The proper standard by which to assess the MTA's restriction is "viewpoint neutral and reasonable." As Defendants argue, the MTA's purpose in

13

designating its property a limited public forum was to "exclude advertising of a political nature." Compl., Ex. I at 1. *See* Dkt. No. 49 at 10. Properly read, the policy designates "Non-Political Commercial Speech" as a Permitted Category. In *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 656 (2d Cir.) opinion amended on denial of reh'g, 89 F.3d 39 (2d Cir. 1995), the Second Circuit held that Amtrak's unwritten policy to exclude political speech from a prominent billboard was a policy of permitting "purely commercial" speech, and that exclusions under that policy need only be "viewpoint-neutral and reasonable in relation to the forum's purpose." Applying that precedent to the facts before the court results in the application of "viewpoint-neutral and reasonable" scrutiny, not strict scrutiny. Judge Koeltl recently reached the same result in the AFDI case. AFDI III at *6 n.5.

But in the end, it does not matter. Even under the lower standard, the MTA's decision to exclude VQP's ads does not pass muster.

### 2. Analysis of the MTA's Decision

#### a. VQP's Advertisements Are Commercial in Part

VQP's advertisements are undoubtedly commercial under the New Policy; they "promote" and "solicit the sale" of VQP's film. Compl. Ex. I § IV.A.1.

Defendants argue that the ads, on their face, do not "read" as commercial ads, because "none of the Ads mention [sic] or suggest [sic] the existence of a film, let alone promote or solicit its sale." Dkt. No. 41 at 23. However, each of VQP's advertisements clearly directs the viewer to visit www.themuslimsarecoming.com. Compl. Ex. A-F. VQP's decision to attract visitors to the film's website via humor, rather than by literally describing its product, is a strategic choice, and a fairly standard one, at that; it has no bearing on the fundamentally commercial nature of the message.

14

### b. VQP's Advertisements Are Not Reasonably Deemed "Political in Nature"

VQP's advertisements cannot reasonably be deemed "political in nature" under the New Policy.

Defendants are of course correct that commercial ads can also be "political in nature" under the MTA's New Policy. Dkt. No. 41 at 20-21. However, that commercial advertisements share subject matter with a hot-button cultural topic does not necessarily render those advertisements "political." Rather, as that term is defined in the New Policy, an advertisement is "political in nature" if it is "directed or addressed to the action, inaction, prospective action or policies of a governmental entity" or if it "prominently or predominately advocate[s] or express[es] a political message." Compl. Ex. I § IV.B.2. "Political message" is defined as including "an opinion, position, or viewpoint regarding disputed economic, political, moral, religious or social issues or related matters, or support for or opposition to disputed issues or causes." *Id.*

Defendants cannot plausibly argue that Plaintiff's advertisements – humorous or satirical statements suggesting that American Muslims are just like other Americans and directing viewers to the website for Plaintiff's film, which contains similar content – address the behavior or policies of a government entity. Nor do they. Instead, Defendants suggest that these advertisements "prominently or predominately advocate[s] or express[es] a political message." Dkt. No. 41 at 14; Farsad Decl. Ex. 45.

But to "prominently or predominately" advocate or express a political viewpoint, an advertisement must do far more than refer to a subject about which there is a lack of national consensus. That some individuals may hold Islamophobic views does not turn the punchline that "Muslims have great frittata recipes" into a message that "prominently or predominately ...

15

advocates a[] ... viewpoint regarding [a] disputed ... political ... or social issue[]." And that the advertisements at issue gently mock prejudice and employ Islamophobia as a comedic device does not make their message "prominently or predominately" political.

That Plaintiff's advertising campaign was prompted, in part, by AFDI's desire to post hateful messages about Muslims in the subways does not in and of itself render VQP's advertisements "political in nature." That a commercial enterprise would seek to capitalize on controversy – namely, the advertising campaign of a pro-Israel advocacy organization known for its public criticism of Islam – is hardly surprising. *See* Dkt No. 46 at 9. VQP is a for-profit film production company, not an advocacy group. It has no specific political agenda or policy demands; it is not on a civil rights crusade. VQP saw an opportunity to reintroduce its brand of humor and promote DVD sales of a film about Muslim comedians and their interactions with Americans – and took it. That VQP used public support for the film's message and public dislike of AFDI's *modus operandi* to garner attention and finance its campaign does not transform the essential non-political nature *of the advertisements themselves*! The text of the messages that would be posted in the subways is not "prominently or predominantly political" – unless we have reached the unhappy moment in this country where the mere mention of one of the three Abrahamic faiths is "prominently or predominantly political" simply because that faith is Islam.

Finally, although Defendants argue that Plaintiffs' ads are "political" under the definition provided in the New Policy, the MTA notes that its prohibition on political speech proscribes more than speech that satisfies that precise definition; the New Policy states that prohibited political speech "*includ[es] but [is] not limited to*" advertisements that "prominently or predominately advocate or express a political message." Compl. Ex. I § IV.B.2. It is true that Plaintiffs' advertisements are not purely commercial in nature; they send a message as well as

16

sell a product. The questions is whether that message – one that promotes tolerance over bigotry – is political speech, even though it does not fall within the definition provided in the New Policy. As the MTA has provided no information about what else might constitute "political" speech, I cannot conclude that VQP's ads are political on their face, and an arbitrary conclusion by some official at the MTA, untethered to any articulated or articulable standard, that an advertisement including the word "Muslims" is "political," is utterly unreasonable.

### c. Defendants' Determination that VQP's Ads were "Political in Nature" Is not Viewpoint Neutral

Defendants' designation of the advertisements as political, and therefore prohibited, was not viewpoint neutral.

The very fact that Defendants delved so deeply into whether VQP had a political objective is evidence of Defendants' lack of viewpoint neutrality. As part of the approval process, the MTA sought information about VQP itself, and Outfront provided the MTA with a list of companies with which VQP had worked. Farsad Decl. ¶ 20. Outfront identified VQP's ads as potentially violative of the policy, and Defendants largely justify their decision not to run VQP's ads with evidence of VQP's motive for creating its ads – since the ads themselves hardly justified the decision. *See* Dkt No. 41 at 24-28. There is no evidence that this sort of delving into motive is standard practice when determining whether an ad is "political in nature," or that Defendants engaged in this same process for any other ad.

Indeed, the evidence before the court plainly indicates that VQP's silly advertisements were subject to greater scrutiny than other potentially controversial ads. An advertisement for Freelancers Union that was accepted by the MTA and displayed in the subways included the following text, in comic book-style font: "Funny how corporations are people when it comes to politics but faceless machines when it comes to PAYING actual people." Dkt. No. 53, Exhibit A.

17

It was only after this lawsuit began, and someone pointed out the inconsistency between running the Union's ad and not running VQP's ads, that Defendant Rosen notified Outfront that the advertisement did not comply with the New Policy and should be removed. Dkt. No. 56, Exhibit A ¶ 8. The fact that this ad was initially accepted for publication and actually appeared in the subways – until it became inconvenient to run it because of the pendency of this lawsuit – utterly undermines the MTA's assertion that its decision as to VQP's ads was viewpoint neutral, while bolstering Plaintiff's claim that it was subject to an "unduly slow and intricate review process" and faced a greater degree of scrutiny than other prospective advertisers. Dkt. No. 57 at 1.

Defendants admit that the MTA's "rigorous and careful" review of Plaintiff's ads was prompted by the fact that Plaintiff was motivated by a desire to counter the sentiments of AFDI's ads. Dkt. No. 49 at 10. Defendants contend that "there is nothing … viewpoint-discriminatory" about that fact. *Id.* But evenhandedness does not satisfy viewpoint neutrality. Assuming, *arguendo*, that VQP's ads *were* political, refusing to run two sets of advertisements on either side of a political debate about Islam and Muslims cannot be deemed viewpoint neutral when the MTA has approved other advertisements addressing issues of cultural import that are similarly, or far more, "political." For example, after rejecting VQP's ads, Defendants ran ads for CNN's coverage of a Republican presidential debate. Those ads contained photographs of candidates alongside prominently displayed quotes, such as John Kasich's "It is a bad system when billionaires can pick the one who can be the president." Decl. of Dean Obeidallah ¶ 3, Ex. 1–4. To suggest, as the MTA's actions do, that an advertisement for the Republican presidential debate with photographs and quotes from candidates is somehow less "political" than humorous statements about the Muslim population's dislike of both terrorism and insufficient bagel schmear is, quite clearly, not viewpoint neutral. *See* Compl. Ex. E.

18

Defendants also ran ads for the television show Mr. Robot that prominently state: "PRIVACY IS A MYTH," "CORPORATIONS OWN YOUR MINDS" and "BANKS OWN YOUR MONEY." Decl. of Jordan Wells ¶ 4, Ex. 1. Those ads for a television show are more blatantly "political," as that term is defined in the New Policy, than are VQP's ads for its movie, which take on religious intolerance with gentle humor.

Thus, VQP has demonstrated that Defendants' refusal to display its advertisements was not reasonable and viewpoint neutral and has established a clear or substantial likelihood of success on the merits.

## B.   The Balance of Equities and the Public Interest Favor Granting the Injunction

In determining whether the balance of equities tips in VQP's favor and whether granting the preliminary injunction would be in the public interest, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotations and citations omitted). The balance of equities tips in favor of granting VQP's request for a preliminary injunction. VQP seeks only to uphold its First Amendment rights, which have been unlawfully abridged. The effect on VQP, therefore, is substantial. Defendants, however, are only requested to display VQP's advertisements in their subway system – something Defendants had, not very long ago, actually agreed to do.

The public interest also favors granting injunctive relief for VQP. "[S]ecuring First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Again, VQP's First Amendment rights are at stake. A public entity like the MTA certainly has an interest in "maintaining and enforcing its advertising policy as written." Dkt No. 41 at 32. But here, since the MTA incorrectly applied its own policy, it is unable to

19

demonstrate that it is acting in the public interest by refusing to display VQP's ads. Defendants cannot establish any comparable compelling public interest that would warrant infringing on VQP's First Amendment rights.

## VIII. Plaintiff's Motion for a Preliminary Injunction for Violation of the First Amendment under the Prior Policy is Moot

In addition to its request for a preliminary injunction for a violation of the First Amendment under the New Policy, VQP asks the Court for a preliminary injunction because the MTA violated the First Amendment under the Prior Policy. VQP argues that "Defendants violated VQP's constitutional rights by purposefully and unreasonably delaying the approval of VQP's Advertisements for four months." Amended Compl., Dkt. No. 22 ¶ 50. It seeks a mandatory injunction compelling the MTA to display its ads for 28 days, which is the number of days the ads would initially have been displayed had approval been forthcoming promptly.

Plaintiff's motion for a preliminary injunction under the Prior Policy is moot for two reasons. First, injunctions are forward looking, and the Prior Policy does not exist anymore. VQP's claim for injunctive relief under the Prior Policy is rendered moot by the enactment of the New Policy. AFDI III at *3-6 (S.D.N.Y. June 19, 2015). Second, as VQP's motion for a preliminary injunction under the New Policy has been granted, its claim for a preliminary injunction under the Prior Policy is now moot as duplicative.

## IX. Defendants' Motion to Dismiss the Complaint is Granted in Part and Denied in Part

Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's claims.

Obviously, the motion is denied insofar as it is directed at Plaintiff's claim for relief for violation of its First Amendment rights under the New Policy. Not only has VQP has "pleaded factual content that allows the court to draw the reasonable inference" that Defendants have

20

violated VQP's First Amendment rights, *Iqbal*, 556 U.S. at 678, it has established that Defendants' determination that the ads were "political in nature" was unreasonable and lacked viewpoint neutrality.

As for Plaintiff's claim for violation of its First Amendment rights under the Prior Policy, the claims for injunctive relief are moot and so are dismissed. However, the Court must determine whether the claim for nominal damages withstands a motion to dismiss. Even where a change in policy renders injunctive relief moot, "nominal damages [for violation of First Amendment rights] relating to *past* (not future) conduct" should not necessarily be dismissed. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526-27 (10th Cir. 1992). Indeed, "precisely because nominal damages afford a litigant vindication of the deprivation of his constitutional rights, the decision to dismiss a plaintiff's claim ... because only nominal damages are at stake is error." *Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311, 320 (2d Cir. 1999).

VQP has sufficiently alleged a violation of the First Amendment resulting from the MTA's application of the Prior Policy. Plaintiffs contend that Defendants purposefully deferred approving their ads by requesting changes not required by the Prior Policy and through sheer delay in responding. Dkt. No. 45 at 23-25. The claim that the four-month time period between submission and approval was motivated by reluctance to display VQP's ads due to their content, or to gain advantage in the MTA's ongoing litigation with AFDI, is entirely plausible. Plaintiff has supported its allegations with sufficient factual content, including that Outfront acknowledged to VQP that the process was taking "longer than usual," and that Defendants cited their rejection of VQP's advertisements in the litigation with AFDI to support the MTA's position that the rejection of the AFDI Ad was not viewpoint discrimination. Farsad Decl. ¶ 16, Ex. 16; Dkt. No. 52 n.6.

21

## CONCLUSION

For the foregoing reasons, the preliminary injunction is granted and the motion to dismiss

is granted in part and denied in part. The Clerk of the Court is directed to remove the motions at

Docket Nos. 30 and 39 from the Court's list of pending motions.

Dated: October 7, 2015

<u>Colleen McMahon_____</u>

U.S.D.J.

BY ECF TO ALL COUNSEL